IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HENRY WAYNE RICHARDSON,   )
  )
    Plaintiff,   )
  )
v.   )    CASE NO.: 2:16-cv-00828-SRW
  )
KOCH FOODS OF ALABAMA, LLC,   )
  )
  )
    Defendant.   )

## MEMORANDUM OPINION AND ORDER

This matter is before the court on defendant's motion for summary judgment. Doc. 34.[1] For the reasons stated below, the motion is due to be granted.

## Facts

Plaintiff Henry Wayne Richardson was employed as a truck driver with defendant Koch Foods from October 2011 until his termination on September 24, 2014. (Doc. 36-4 at 24–25, 152–53). In the personnel action form terminating plaintiff, defendant states that plaintiff was terminated for "job abandonment."(Doc. 40-12). John James was the Koch Foods feed mill manager during the period of plaintiff's employment. Jacob Cheatham was the assistant manager and plaintiff's direct supervisor. Carlos Adkins was the lead driver and reported directly to Cheatham. (Doc. 36-2 at 11:1–16).

---

[1] On December 15, 2016, the parties consented to final dispositive jurisdiction by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). *See* Docs. 15; 16.

Truck drivers at Koch Foods were regularly scheduled to work six days per week. (Doc. 36-4 at 49–50). In order to receive a day off, drivers were required to submit a form requesting the day off, subject to their supervisor's approval. *Id.* at 70–72. If a driver was allowed the day off, a vacation day would be charged from his or her allotted number of vacation days per year, although plaintiff contends that he was unaware of this policy at the time. *Id.* at 71–72.

Koch Foods dispatchers assist in loading trucks with feed and telling the drivers where to deliver the loads. (Doc. 36-2 at 20). Dispatchers are hourly employees who do not have supervisory authority over truck drivers. (Docs. 36-1 at 55, 36-2 at 20). Delivering feed from the mill typically takes a predictable number of hours. If the amount of time to make the feed run would not allow a driver to deliver a load and then return the truck before the end of the shift, the truck driver typically was released from work before the end of his shift by his supervisor. (Doc. 36-1 at 54–55). Dispatchers were not allowed to release truck drivers directly without obtaining a supervisor's approval. *Id.* at 55. Although it appears that dispatchers had some influence over whether truck drivers could be released from work early if a load would take too long into the next shift to deliver, or the feed mill was nonoperational, supervisory approval was still required for the early release of a truck driver. (Doc. 36-2 at 13–14).

### a. Plaintiff's employment with defendant prior to his heart blockage

The record does not reflect any apparent issues with plaintiff's employment with defendant prior to early 2013. On January 7, 2013, plaintiff received a write-up for insubordination for refusing to drive another load from the feed mill. (Doc. 36-8). Plaintiff

responded to the write-up that he saw "no reason" to wait around when there was no feed. *Id.* On March 2, 2013, plaintiff received a verbal warning about his attendance. The form states that plaintiff had accumulated 3.5 attendance points (although the record is unclear as to what is a typical number of attendance points). (Doc. 36-9). Plaintiff often requested Saturdays off work in order to spend time with his daughter. Plaintiff contends that prior to Cheatham's being his supervisor, defendant would honor his request to take Saturdays off to spend with his daughter without docking him a vacation day, but that this policy changed with Cheatham. (Doc. 36-4 at 71:10–16). Notwithstanding plaintiff's testimony in this regard, the record shows that some of his requests were granted and plaintiff was charged a vacation day, while others were denied. *See* Docs. 36-6, 36-7.

In April 2013, plaintiff met with Shawn Collins and David Birchfield, HR managers for Koch Foods. In that meeting, plaintiff expressed concerns that Cheatham was ignoring his requests for time off and incorrectly issuing attendance points against him. Plaintiff also indicated that he felt retaliated against by Cheatham for questioning Cheatham's handling of the March attendance write-up and for his lack of professionalism with employees. (Doc. 36-12).

### b. Plaintiff's employment with defendant subsequent to his heart blockage

On August 18, 2013, plaintiff suffered an acute inferior wall myocardial infarction, and a stent was placed in his right coronary artery. (Doc. 36-13). Defendant's supervisors learned of plaintiff's heart issue and procedure around that same time. (Doc. 36-1 at 16). On September 25, 2013, plaintiff's physician released him to return to work without restriction. (Doc. 36-13). Plaintiff's heart condition and subsequent surgery did not impede

his ability to do his job, walk, stand, eat, care for himself, or sleep. (Doc. 36-4 at 97:23–99:18).

Steve Bohannon was a lead truck driver at Koch Foods. (Doc. 36-20 at 24:5–6). He testifies that he overheard a conversation between James and Cheatham about plaintiff. *Id.* at 42. According to Bohannon, all three were in an office with the blinds shut when James told Cheatham to begin denying plaintiff his Saturday requests off so that plaintiff would miss work and they could write him up and terminate him. *Id.* at 41–42. Bohannon indicates that the men thought plaintiff was a "liability" for having a heart attack. *Id.* at 42. Bohannon could not recall when the conversation occurred, but he estimates that it was about six months prior to Bohannon's March 2014 termination. *Id.* at 42–43. Bohannon acknowledged that the policy at Koch Foods was that drivers were required to get permission from a supervisor before they could leave early. *Id.* at 86:4–17. On February 17, 2014, Bohannon suffered a heart attack and underwent surgery. *Id.* at 34:25–35:4. Bohannon was terminated for "poor job performance" on March 14, 2014. (Doc. 36-25). Much later, in a conversation with plaintiff about their respective terminations, Bohannon learned that Koch Foods had a photograph of Bohannon asleep at his desk. Doc. 36-20 at 28–30.

On February 20, 2014, plaintiff received a "1st written" warning from Cheatham for leaving work early without permission and with time to deliver a load already on his trailer. (Doc. 40-5). Plaintiff refused to sign the warning. He noted that he was concerned about having the truck ready and pre-loaded for the next shift and he did not have sufficient time to finish the route. (Doc. 36-4 at 99:19–106:12). Plaintiff acknowledges that he did not ask

a supervisor's permission to leave work, despite having their cell phone numbers. *Id*. On August 14, 2014, plaintiff received a written warning for attendance that specifically cited his absences on July 21 and August 14, and his leaving work early on August 4. (Doc. 40-6). Plaintiff again refused to sign this warning.

Plaintiff testified that in spring 2014 he made verbal complaints to Human Resources (HR) personnel, including manager David Birchfield, Bobby Elrod, Shawn Collins, and Rhonda Ogle. (Doc. 36-4 at 176–79). However, plaintiff did not mention to Elrod, Collins, or Ogle his heart attack or the possibility that he was being treated differently based on the fact that he had had a heart attack the summer before. In spring of 2014, plaintiff speculated to Birchfield that maybe Cheatham was treating him poorly because "[Cheatham] thinks I'm messing with his girlfriend or because I had a heart attack." *Id.* at 176.

On September 11, 2014, plaintiff filed a written complaint of harassment against Cheatham with Shawn Collins of HR. In the complaint plaintiff "formally charg[es] Jay Cheatham with harassment" and complains that Cheatham's "rules and enforcement differ from day to day and driver to driver." (Doc. 40-7). In that written complaint there is no mention of plaintiff's heart condition and procedure of August 2013. *See id.* The record does not show any follow-up from anyone at Koch Foods regarding this complaint.

On September 20, 2014, plaintiff began working at 5:00 a.m. At around 1:15 p.m., after he had been working for eight hours, he was told by dispatcher Tommy McCray that the feed mill was under repair and no loads would be available to be taken for another 1.5 hours. (Doc. 36-4 at 145:15–152:1). Plaintiff claims that McCray gave him permission to

go home and said that the night shift would take care of the remaining eight loads. *Id.* at 147. Plaintiff acknowledges that he did not ask a supervisor for permission to leave early. He also acknowledges that he drove only one load on September 20, 2014, but he maintains there were other drivers that also drove only one load before leaving for the day. *Id.* at 150–53. Although defendant contends that plaintiff was the only driver who took just one load that day, the documents submitted by defendant do not support this contention.[2]

On September 24, 2014, James asked plaintiff whether he had been driving a full load on the interstate in violation of federal law and company policy. Plaintiff admitted that he had. *Id.* at 152–53; Doc. 36-19. James also confronted plaintiff about leaving early on September 20, 2014, and plaintiff admitted that he did leave early. James terminated plaintiff at the end of that conversation. (Doc. 36-19).

### c. Procedural Background

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on November 22, 2014. (Doc. 40-13). In his charge, he claims discrimination in violation of the American with Disabilities Act (ADA), as amended, because of his disability or perceived disability. *Id.* On the EEOC form, the only box checked regarding his discrimination is "disability." An EEOC determination was issued April 11, 2016. (Doc. 40-14). The EEOC investigation concluded "that the evidence

---

[2] In its motion for summary judgment, Koch Foods contends that "Richardson was the only driver who took only one load that day." In support, the motion cites two exhibits, a drivers log supposedly from that day (Doc. 36-17) and an affidavit of Carlos Adkins (Doc. 36-18). Despite what these exhibits purport to establish, both documents are silent as to how many loads drivers took on September 20, 2014.

obtained during the investigation established that there is reasonable cause to conclude that the Charging Party was discriminated against on the basis of retaliation, in violation of the [ADA]." *Id.*

On October 18, 2016, plaintiff filed a three-count complaint against defendant asserting claims for disability discrimination in violation of the ADA (first count), unlawful retaliation under Title VII (second count), and retaliatory hostile work environment under Title VII (third count). Both counts two and three cite to Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000(e), *et seq.*), and the 1991 Civil Rights Act, and 42 U.S.C. 1981(a). (Doc. 1). Defendant moves for summary judgment on the Title VII claims set out in the second and third counts, arguing that plaintiff failed to exhaust his administrative remedies because he did not raise a Title VII violation with the EEOC or otherwise claim that his termination was based on a reason made unlawful under Title VII – *i.e*, race, color, sex, religion or national origin. (Doc. 34 at 1–2). Defendant argues that plaintiff's disability claim in count one fails because he is not disabled as that term is defined under the ADA, and he cannot proceed under a "regarded as" theory because his heart condition was a minor and transitory impairment. Defendant contends that, even if plaintiff can establish that he is disabled, he cannot show a causal connection between his termination and his disability. Further, defendant submits that plaintiff did not get along with Cheatham prior to his heart condition. Finally, defendant argues that it had a non-discriminatory reason for terminating plaintiff.

## Summary Judgment Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact issue is "genuine" if a rational trier of fact could find for the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must "examine the evidence in the light most favorable to the non-moving party," drawing all inferences in favor of such party. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). If the movant adequately supports its motion, the burden shifts to the opposing party to establish—"by producing affidavits or other relevant and admissible evidence beyond the pleadings"—specific facts raising a genuine issue for trial. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981), *cert. denied*, 456 U.S. 1010 (1982). "If the evidence is such that a reasonable jury could return a verdict for the non-moving party" then a genuine issue of material fact exists and a summary judgment motion must be denied. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242 (1986).

**Discussion**

a.      **Title VII claims – counts two and three**

Defendant contends that it is entitled to summary judgment on counts two and three because plaintiff failed to exhaust his administrative remedies as to his Title VII claims. Before filing a Title VII claim, a plaintiff must exhaust certain administrative remedies. *See E.E.O.C. v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1271 (11th Cir. 2002); *see generally* 42 U.S.C. § 2000e–5. The administrative process begins with the timely filing of a charge of discrimination. *Joe's Stone Crabs, Inc*., 296 F.3d at 1271. "The [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983). The intent behind requiring the initial involvement of the "good office" of the EEOC is to promote informal cooperation and resolution between the complaining and responding parties. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989). Claims in a judicial complaint not first brought before the EEOC cannot be considered before the court and a claimant may not "raise new acts of discrimination" in the judicial proceedings. *Id*. While courts in this circuit are reluctant to find that technicalities bar employment discrimination claims, *see Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004), the *Wu* court explained the appropriate scope of the court's review as follows:

> As long as allegations in the judicial complaint and proof are "reasonably related" to charges in the administrative filing and "no material differences" between them exist, the court will entertain them. As we have noted ..., "the 'scope' of the judicial complaint is limited to the 'scope' of

the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."

Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate.

*Wu*, 863 F.2d at 1547 (citing *Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir.1980) (internal citations omitted)).

In his November 22, 2014 charge of discrimination, plaintiff stated that he believed he was terminated based on his disability or his perceived disability. (Doc. 40-13). The EEOC responded, finding that there was "reasonable cause to conclude that [plaintiff] was discriminated against on the basis of retaliation, in violation of the Americans with Disabilities Act of 1990, as amended." (Doc. 40-14). Thus, there appears no doubt that plaintiff, who filed his EEOC claim *pro se*, properly noted all acts of discrimination and exhausted his claims as related to any ADA claim.

Counts two and three of the plaintiff's complaint, however, are brought under Title VII, not the ADA. Specifically, those counts are brought under "Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000(e), *et seq.*), and the 1991 Civil Rights Act, and 42 U.S.C. 1981(a)." (Doc. 1 at 7, 9). Count two asserts a claim for retaliation under Title VII, and count three alleges a claim for hostile work environment under Title VII. *See id.*

Title VII makes it unlawful to discriminate against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's *race, color, religion, sex, or national origin*." 42 U.S.C. § 2000e-2 (emphasis

added). Section 1981 guarantees all people equal rights under the law. *See* 42 U.S.C. § 1981(a) ("All persons…shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."). Nowhere in plaintiff's EEOC charge or his complaint does plaintiff mention discrimination based on his race, color, sex, or national origin. Plaintiff does not check any of the boxes on his charge that relate to discrimination based upon any characteristic protected by Title VII, nor does he describe any acts of discrimination based on anything other than a disability or perceived disability under the ADA. *See* Doc. 40-13. Moreover, the EEOC did not analyze plaintiff's claims under Title VII. *See* Doc. 40-14. Even plaintiff's complaint fails to make any allegation of discrimination based upon a characteristic protected by Title VII. *See* Doc. 1. There is simply no factual support for a Title VII claim before the court.

Plaintiff responds to defendant's motion that he "establishes a prima facie case of retaliation under the ADA." (Doc. 40 at 16). But this is not a claim pled in plaintiff's complaint. The claim in count two is for retaliation under Title VII, *see* Doc. 1 at 7–8, and in count three for retaliatory hostile work environment under Title VII, *see id.* at 9. Plaintiff fails to show that he raised any issue regarding a claim under Title VII before the EEOC. His charge is silent as to a Title VII claim, as is the EEOC investigation. Accordingly,

defendant's motion is due to be granted as to plaintiff's Title VII retaliation claim in count two and plaintiff's Title VII hostile work environment claim in count three. [3]

---

[3] Even if these claims were properly exhausted, they would not survive the motion for summary judgment. To establish a *prima facie* case of retaliation under the ADA, plaintiff must show that he (1) was engaged in statutorily protected activity, (2) was subjected to a materially adverse action, and (3) the materially adverse action was because of the protected conduct. 3C Fed. Jury Prac. & Instr. § 172:24 (6th ed.); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). A plaintiff engages in protected activity when he complains about an action protected under the ADA. *See Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). It is undisputed that plaintiff suffered a materially adverse action in his employment when he was terminated. However, his retaliation claim fails on the other two prongs.

Protected activity includes bringing or participating in formal actions to enforce ADA rights and informal activity such as requesting an accommodation for a disability. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003). Here, while it is undisputed that plaintiff complained in writing of "harassment" by Cheatham on September 11, 2014, and complained verbally to defendant's HR staff in the spring of 2014, there is little evidence that these complaints had any connection to plaintiff's heart condition. Plaintiff never requested an accommodation. In the written complaints plaintiff gave to management and HR regarding harassment by Cheatham, he did not mention the heart attack or his health. He never had a conversation about his heart condition with management. The sole mention of his heart condition to which he points as a source of protected activity is the conversation he had with HR manager David Birchfield in which he speculates that Cheatham gave him a hard time because Cheatham thinks plaintiff is "messing with his girlfriend" or because he "had a heart attack." Such speculation cannot be considered protected activity.

Even if a connection could be drawn between plaintiff's complaint on September 11, 2014 and his termination 13 days later, nothing in his written complaint mentions his heart condition or anything about a disability. Moreover, the evidence shows that plaintiff received reprimands prior to his heart attack, and that he complained to HR about Cheatham prior to this heart surgery. After his heart surgery, there was relative calm until six months after the surgery when plaintiff received another write-up. There must be stronger evidence of a connection between the alleged disability and the termination for Mr. Richardson to establish a causal link for purposes of ADA retaliation. The relationship between the written reprimands that plaintiff received, his complaints about Cheatham, and his termination are too tenuous, and lack sufficient temporal proximity, to establish an ADA retaliation claim.

In addition, "in order to succeed on [an ADA hostile work environment] claim, the plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. To be actionable, behavior must be both objectively hostile or abusive, as judged by a reasonable person, and subjectively abusive to the actual victim." *Woodruff v. Sch. Bd. of Seminole Cty., Fla.*, 304 F. App'x 795, 799 (11th Cir. 2008) (internal citations and quotation omitted). Plaintiff's hostile work environment claim is based upon his being assigned bad loads, two write-ups over an eight-month period, and denials of days off from work and/or being charged vacation days for time off from work. In addition to the fact that most of these discrete discriminatory acts took place more than nine months prior to

### b.      Disability claim – count one

Defendant seeks summary judgment on plaintiff's disability discrimination claim in count one. Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Hilburn v. Murata Elecs. N. Am., Inc*., 181 F.3d 1220, 1226 (11th Cir. 1999) (quoting 42 U.S.C. § 12112(a)). To state a claim under the ADA, a plaintiff must establish a *prima facie* case that "(1) he has a disability, (2) he is a qualified individual[4], and (3) he was subjected to unlawful discrimination as a result of his disability." *Gordon v. E.L. Hamm & Assoc.*, 100 F.3d 907, 910-911 (11th. Cir. 1996). "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Combs*, 106 F.3d at 1528 (*quoting Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)) (internal quotations marks omitted). If a plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to defendant "to articulate some legitimate, nondiscriminatory reason for the employee's

---

the date of the charge, the evidence simply does not demonstrate that plaintiff was subjected to an objectively and subjectively hostile work environment.

[4] A qualified individual is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

rejection." *Id.* If defendant meets its burden, a plaintiff must then prove by a preponderance of the evidence that the legitimate, nondiscriminatory reasons offered by defendant are a mere pretext for discrimination. *Id.* at 804–05. The ultimate burden of persuasion, however, remains at all times with the plaintiff.

In this case, plaintiff claims that defendant recognized his condition as a disability and terminated him at least in part based on that disability. Defendant contends that plaintiff's heart condition was not disabling under the ADA and that, regardless, plaintiff was terminated for legitimate and nondiscriminatory reasons. Plaintiff asserts that the reasons offered for termination are a pretext for discrimination.

## 1. Disability under the ADA

The ADA defines disability as (a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) the record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102 (1). In order for a plaintiff to establish that he has a "disability" as defined under the ADA, the plaintiff must show that he has a physical or mental impairment that "substantially limits one or more of [his] major life activities." 42 U.S.C. § 12102(1). Major life activities include (but are not limited to) caring for oneself, performing manual tasks, walking, standing, lifting, bending, and working. *Id.* at § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). A limitation that is short term and temporary, even if severe, is not evidence of a disability. *Diaz v. Transatlantic Bank*, 367 Fed. App'x 93, 98 (11th Cir. 2010) (*quoting Garrett v Univ. of Ala. At Birmingham Bd. of Trs.*, 507 F.3d 1306, 1315 (11th Cir. 2007)).

In this case, plaintiff's claims of disability arise from his heart blockage and the procedure to correct the blockage. Because of these issues, he was out of work for six weeks. The parties appear to agree that, although plaintiff endured a serious heart operation, he was able to return to full-duty status without any restrictions and without any apparent limitation to a major life activity, and a letter from his doctor confirms this. (Doc. 36-13). Plaintiff testified that there was no activity that he was unable to do after he underwent surgery to address the blockage. (Doc. 36-4 at 98). Therefore, plaintiff does not have a disability as defined under the ADA. S*ee* 42 U.S.C. § 12102 (1).

### 2. "Regarded as" Disability

A plaintiff may also establish a prima facie disability if it is shown that the employer regarded the plaintiff as having a disability. 42 U.S.C. § 12102 (1)(c).[5] The ADA Amendments Act of 2008, Pub. L. No. 110-235, 122 Stat. 3553, "explicitly eliminated the substantial limitation requirement for regarded as claims." *Feltman v. BNSF Railway Company, Inc.*, 2018 WL 529952, at *9 (N.D. Ala. 2018)(citation and internal marks omitted.). The ADA now provides that an individual will be "regarded as" disabled if the individual establishes that "'he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Id*. (citing 42 U.S.C. § 12102(3)(A)). The Supreme Court has explained that a person is 'regarded as' disabled

---

[5] "Despite the changes brought about by the ADAAA, the elements of a plaintiff's *prima facie* case remain the same." *See Barlow v. Walgreen Co.*, 2012 WL 868807, at *4 (M.D. Fla. Mar. 14, 2012).

within the meaning of the ADA if the employer mistakenly believes that the impairment is limiting. *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999).

The ADA provides, however, that a "regarded as" claim "shall not apply to impairments that are transitory [*i.e.* less than six months' time] and minor." 42 U.S.C. § 12102(3). Whether the impairment at issue is or would be considered "transitory and minor" is to be determined objectively. 29 C.F.R. § 1630.15. Courts in other circuits have found that injuries or conditions did not qualify as disabilities for purposes of the "regarded as" section of the ADA when a doctor's note indicated relatively short recovery times. *See, e.g., White v. Interstate Distrib. Co.* 438 F. Appx. 415, 420 (6th Cir. 2011) (finding that a plaintiff's lower leg injury was transitory and minor because his doctor expected restrictions to only be in place for a month or two); *Cobb v. Florence City Bd. of Educ.*, 2013 WL 5295777 (finding that plaintiff's post-surgery knee problems would cause the plaintiff to miss work for only three months). Moreover, a person whose physical impairment is corrected by medication or other measures does not have an impairment covered by the ADA. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1264 (11th Cir. 2007).

While heart blockages can be serious and, and in many cases, life-threatening, there is no evidence here to establish that plaintiff's heart condition and subsequent surgery was anything but relatively routine. Dr. Malik's letter states that plaintiff was cleared to return to work only six weeks after the discovery of the blockage. Plaintiff himself denies any long-term issues with his heart, or any limitations, either then or now. While this is good news for plaintiff's health, it is fatal to his claim of being "regarded as" disabled.

Plaintiff compares his health condition to that of the plaintiff in *Davis v. Sailormen, Inc.,* 281 Fed.Appx. 958, 960 (11th Cir. 2008), who was born with her right arm shorter than her left. (Doc. 40 at 10.) However, a heart blockage that leads to a return to work in six weeks is fundamentally different from a congenital difference in arm length that cannot be corrected. Plaintiff also argues that there is evidence on the record that defendant's management did not perceive him as "trustworthy no more because he had a heart attack" and that these "rumors" persisted well into the summer of 2014 (almost a year after he returned to work). (Doc. 36-4 at 58). While there may have been "rumors," more objective facts are needed to establish that management at Koch Foods perceived plaintiff's heart condition as anything but relatively short-term.

While it is undisputed that plaintiff felt that Cheatham's write-ups and responses to his attendance and time-off requests were mean-spirited, this does not establish that defendant perceived plaintiff as disabled, particularly where 13 months passed between his surgery and termination. Plaintiff's comment to HR manager Birchfield as to possible reasons why he was receiving poor treatment from Cheatham – that "he [Cheatham] thinks I'm messing with his girlfriend or because I had a heart attack" (Doc. 36-4 at 176:1–9) – was made more than eight months after his heart surgery, and it is too speculative to establish plaintiff's claim that defendant regarded him as disabled. Because plaintiff's heart condition and surgery are considered transitory and minor, they cannot support plaintiff's "regarded as" claim.

### 3. Causal relationship between plaintiff's heart condition and termination

Even if plaintiff were able to show that his heart condition was more than minor and transitory and that defendant regarded him as disabled, plaintiff must also show that the termination was because of his alleged disability. The Eleventh Circuit has not directly decided whether a "mixed motive" theory is cognizable under the ADA. *Parsons v. First Quality Retail Svcs.*, LLC, 2012 WL 174829, *8 (M.D. Ga. Jan. 20, 2012). The court's decision in *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016) may have changed the requirements for a plaintiff to survive summary judgment in a Title VII context, by requiring the employee only to produce evidence that "discriminatory input" was factored into the "employment process." However, the *Quigg* decision is in the context of a Title VII dispute. The ADA is a different statute with different language. Other circuits have decided that, under the ADA, the disability must be the "but for" reason for the termination or adverse employment action. *See, e.g.*, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (reasoning that rules of statutory construction do not permit the term "motivating factor" to be read into the ADA in the same way as for Title VII). Other district courts in this circuit have also taken this "but-for" approach in the ADA context. *See, e.g., Savage v. Secure First Cred. Union*, 107 F. Supp. 3d. 1212, 1216–17 (N.D. Ala. May 8, 2015), *rev'd on other grounds*, Slip Op., No. 15-12704 (11th Cir. May 25, 2016) ("in order to state a claim of disability discrimination Savage must specifically allege that her disability was the "but-for" cause of her adverse treatment").

Here, even assuming that defendant regarded plaintiff as disabled, plaintiff cannot establish that his perceived disability was the but-for reason for his termination. First, the lapse in time between plaintiff's heart procedure and his ultimate termination does not

produce an obvious causal connection. Plaintiff returned to work, without limitations, in mid-September 2013, only six weeks after his heart procedure. It was not until the following February of 2014 that plaintiff received his next disciplinary write-up. Thereafter, he did not receive another write-up until the summer of 2014 – nearly a year after his heart condition was discovered – for missed absences in July and August of 2014. Such belated and infrequent write-ups over a relatively lengthy period of time do not suggest a focused and concerted effort to terminate the defendant for a perceived disability. Indeed, plaintiff was eventually terminated approximately one year and one month after he returned to work following his heart procedure. The Eleventh Circuit found that a much shorter time lapse of four and one-half months was too remote to demonstrate a causal nexus between the disability or injury and the termination. *See Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 507 F.3d 1306, 1317 (11th Cir. 2007).

Second, plaintiff's clash with defendant's management, particularly Cheatham, appears to have had its inception prior to the discovery of plaintiff's heart blockage. Plaintiff complained to Human Resources about Cheatham's treatment in April 2013, six months before any knowledge of his heart condition. Although plaintiff contends that he was subjected to increased scrutiny after news of his heart condition surfaced, the record reflects that plaintiff was disciplined for leaving work early without receiving supervisory approval prior to the discovery of his heart condition. While plaintiff may have disagreed with the written reprimands, that is a far cry from establishing that defendant was harassing him and "creating a paper trail" in order to fire him *because of his disability*. And, while it may be true that plaintiff and Cheatham clashed on the job and disagreed about plaintiff's

performance, this appears to have occurred as much prior to his heart condition as after. There is no obvious connection between plaintiff's heart condition and his ultimate termination one year later.

Third, under the "but-for" causation standard, plaintiff's own words and actions call into question the reason for his termination. An admission that a plaintiff was terminated for reasons other than his being disabled or as a member of a protected class serves to contradict a finding of discrimination. *See Rothmeier v. Inv. Advisors*, 85 F.3d 1328, 1337 (8th Cir. 1996). In his deposition, plaintiff was asked about why he was terminated:

> Q. Well you said here: "I was terminated because I had rocked the boat by charging Jay Cheatham with harassment and getting the eyes of the company on the feed mill where a lot of things are in need of attention and change." So I'm asking –
>
> A. That's a true statement.
>
> Q. Okay that is what I was asking you, that is your statement. You're saying I can't say why they did such and such.
>
> A. Well that is my statement. I can't say why, what reason they're going to use to say they terminated me. That is my belief why I – I was terminated because I was fired 13 days after I put in writing harassment charges on Jay Cheatham.
>
> Q. Do you believe that you were terminated for any other reason?
>
> A. Well, I think that speeded up the process when I did that. And with some of these write-ups and overturn situations by HR that Jay had done to me, proves that there was harassment and retaliation going on.
>
> Q. Okay, so I need to know what – let me just ask it to you this way: What are all the reasons you contend you were terminated?
>
> A. Because I was a liability in their mind because I had a heart attack.

(Doc. 36-4 at 163–66). While plaintiff claims generally here that he was terminated because he had a heart attack, he also says that he "was terminated because I had rocked the boat by charging Jay Cheatham with harassment and getting the eyes of the company on the feed mill." *Id.* As to Cheatham's apparent anger at plaintiff for complaining about Cheatham's treatment of truck driver employees, it is unclear what connection this has to plaintiff's heart condition. Plaintiff's written complaint "formally charging Jay Cheatham with harassment" shows that plaintiff felt animosity from Cheatham, but it fails to demonstrate how the animosity was related to plaintiff's health. Plaintiff also notes that he complained to HR of poor treatment at the hands of Cheatham in spring 2014. (Doc. 36-4 at 168). However, none of these complaints mention his heart attack suffered the summer before. It may be that plaintiff was correct that changes to safety and oversight at Koch Foods were sorely needed, and that, by complaining, plaintiff drew attention to these shortcomings. But the link to any alleged disability is lacking. Accordingly, even if he were regarded as being disabled by defendant, plaintiff's disability claim fails because he is unable to establish causation.

### 4. Pretext

Plaintiff argues that the reasons given for his termination are merely pretextual and that he was, in fact, fired because of his disability. Defendant maintains that plaintiff's termination was the result of a legitimate, nondiscriminatory reason – namely, plaintiff left work early without permission from a supervisor. The Eleventh Circuit has held that leaving work early without permission is a legitimate reason for termination. *See Archie v. Frank Cockrell Body Shop, Inc.*, 581 F. App'x 795, 800 (11th Cir. 2014). If a defendant

articulates a legitimate, non-discriminatory reason for the employment action, the burden shifts to the plaintiff to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. A plaintiff is required to produce evidence to "allow a finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994). The plaintiff may produce evidence that the defendant's reasons for the adverse employment action contain "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir.1997). Employers properly may assert more than one reason for an employee's termination. *Archie v. Frank Cockrell Body Shop, Inc.*, 581 F. App'x 795, 800 (11th Cir. 2014).

Here, plaintiff admits in the contemporaneous write-up of his conversation with James on September 24, 2014 that he left work early on September 20, 2014. Leaving work early without permission is a legitimate reason to terminate plaintiff. Further, the record establishes that plaintiff had been put on notice via prior written reprimands about leaving early from a shift without supervisor permission. This shifts the burden to plaintiff to show that these legitimate termination reasons are not to be believed.

Plaintiff argues that the conversation between James and Cheatham allegedly overheard by Bohannon is proof that defendant's management wished to create a paper trail in order to fire plaintiff because, post-heart attack, he was a "liability." Assuming that

this conversation occurred, there are problems with this evidence. First, Bohannon guesses that the conversation occurred six months before Bohannon's termination on March 14, 2014 – that is, in approximately October of 2013, one month after plaintiff returned to work and 11 months before he was terminated. But plaintiff's purported "paper trail" does not begin until February of 2014, four months after the conversation occurred and five months after plaintiff returned to work with no restrictions from his doctor. It is a stretch to theorize that James or Cheatham began systematic write-ups as a result of this conversation out of concern that plaintiff's heart condition would make him a "liability." Their actions after this alleged conversation do not reveal such an intention. Remarks that are unrelated to the decision-making process or are temporally remote from the decision-making process are not direct evidence of discrimination. *Allen v. City of* Athens, 937 F. Supp. 1531, 1543 (N.D. Ala. 1996). Plaintiff worked another five months and drove hundreds of truck loads before another write-up was issued. As noted above, too much time elapsed between plaintiff's initial medical condition, the first written reprimand following his surgery, and his eventual termination for the court to conclude that the defendant was engaged in a calculated plan to terminate plaintiff because of his heart condition.

Second, it is unclear how plaintiff's heart condition plausibly made plaintiff a liability in the minds of James and Cheatham. As noted above, plaintiff admits that he was able to return to normal work without any limitations after his procedure. His doctor's note confirms that. No evidence submitted to the court explains how plaintiff's heart blockage, which was resolved by a stenting procedure, would be a liability or perceived as a liability by defendant.

Finally, in the allegedly overheard conversation, James and Cheatham discussed how they were going to conspire to deny plaintiff Saturdays off so that they could eventually fire him for missing work. However, the reason that defendant identifies for terminating plaintiff is that he left work early without permission, not that he skipped a Saturday. Whether the conversation occurred or not, there is no evidence before the court that defendant systematically denied plaintiff's Saturday requests off from work and, thus, nothing in the record supports the argument that James and Cheatham carried through on this supposed plan.

### 5. Defendant employed drivers with heart conditions

"Evidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext." *See, e.g., McDonnell Douglas Corp*., 411 U.S. at 804, 93 S.Ct. 1817. An employer's hiring or employing workers with similar impairments to the plaintiff creates a negative inference of discriminatory intent. *E.E.O.C. v. Grane Healthcare Co*., No. 3:10-250, 2015 WL 5439052 at 56 (W.D. Pa. Sept 15, 2016). In this case, defendant provided information that it had hired multiple drivers who disclosed that they had suffered heart attacks, had heart bypass surgeries, or otherwise suffered from heart conditions. This evidence dispels the inference that defendant opposed employing individuals with heart conditions to work as truck drivers because they could be a liability. Although plaintiff notes that all the drivers listed as having a heart attack had their episodes prior to their employment by defendant, it is unclear why it matters, for purposes of determining defendant's discriminatory animus

towards individuals with heart conditions, whether the heart condition started before or during truck driver employment.

Plaintiff has not succeeded in establishing that defendant's stated legitimate, non-discriminatory reason for terminating his employment was a pretext for discrimination. Accordingly, even assuming he is able to establish a *prima facie* case of discrimination, his ADA disability claims fail as a matter of law.

### c.      Failure to accommodate claim

Defendant argues that plaintiff cannot establish a failure to accommodate claim. In order to survive a summary judgment motion on an ADA claim, a plaintiff must show that: (1) he is disabled, (2) he is a qualified individual, and (3) he was discriminated against because of his disability. *See Reed v. Heil CO.*, 206 F.3d 1055, 1061 (11th Cir. 2000). Under the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical ... limitations of an otherwise qualified individual with a disability …, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business ...." 42 U.S.C. § 12112(b)(5)(A). Therefore, failure to reasonably accommodate a disabled employee constitutes discrimination under the ADA, so long as that individual is "otherwise qualified," unless the employer can show undue hardship. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). In this circuit, a plaintiff must identify an accommodation and demonstrate that the accommodation allows him to perform the job's essential functions. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir.1997). In identifying this accommodation, the plaintiff must show that he

made a demand for the accommodation, or the claim fails as a matter of law. *See Wood v. President & Trs. of Spring Hill Coll. in the City of Mobile*, 978 F.2d 1214, 1222 (11th Cir.1992) ("reasonable accommodation was simply not an issue in this case [as] Wood never alleged, much less established, that she demanded any reasonable academic accommodations from the college because of her handicap"). Here, plaintiff never made a demand for an accommodation due to his heart condition. Indeed, the record reflects that he was able to perform the essential functions of his job after he returned. For this reason, the motion for summary judgment on a failure to accommodate claim is due to be granted.

## Conclusion

For the above-stated reasons, it is hereby

ORDERED that defendant's motion for summary judgment (Doc. 34) is GRANTED, and summary judgment is entered in defendant's favor on all claims. It is further

ORDERED that, in light of the foregoing conclusion, the pending motions to strike (Docs. 42-43) are DENIED as MOOT.

The Clerk is directed to close this case.

A final judgment will be entered separately.

Done, on this the 29th day of March, 2019.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge